749 P.2d 497

**ADA COUNTY HIGHWAY DISTRICT, a body politic, acting By and Through its COMMISSIONERS, Charles L. Winder, Karl Jeppesen and Lawrence C. Jackson, Plaintiffs–Respondents,**

v.

**Victoria H. SMITH, as personal representative of the Estate of Vernon K. Smith, deceased, Victoria H. Smith, individually and Joseph H. Smith, Defendants–Cross Defendants–Appellants,**

and

**Walter P. Kirby and Transwestern, Inc., an Idaho corporation, Defendants–Cross Claimants.**

No. 16573.

Court of Appeals of Idaho.

Jan. 26, 1988.

Vernon K. Smith, Boise, for defendants-cross defendants-appellants.

John Frederick Mack of Holland & Hart, Langroise, Sullivan, Boise, for plaintiffs-respondents.

SWANSTROM, Judge.

This is the second appeal in this case. Ada County Highway District (ACHD) originated this action to abate a drainage water nuisance. The district court's holding in favor of ACHD was affirmed in the first appeal. *Ada County Highway Dist. v. Smith,* 108 Idaho 327, 699 P.2d 427

(1985) (*Smith I*). However, the case was remanded with specific directions clarifying the duties and obligations between the defendants, the Smiths and Kirby. Following remand, the district court found that Kirby had fulfilled his obligation to replace a subdivision drainage pond of sufficient capacity to control discharges of surface drainage water onto the adjoining property of the Smiths. Ada County Highway District was directed to install a pipe and culvert—at the Smiths' expense—which would allow drainage water to flow onto the Smiths' property. The Smiths appeal, contending that Kirby has not constructed a pond with the capacity ordered by the Supreme Court's remand directive. They claim that their property will be subjected to greater flows of drainage water than it received before Kirby's subdivision was built. The general issue is whether the district court's findings are in conformance with the Supreme Court's mandate on remand. We affirm.

As recited in *Smith I*, Kirby, through his company, Transwestern, Inc. (hereinafter Kirby), developed Ruby Subdivision in Ada County on land bordering the Smiths' property near the Boise River. Originally, a pond had been designed and constructed as part of the approved subdivision plan to substitute for a natural water collection area on the developed tract. The pond was located next to the Smiths' eastern boundary at the low point of the subdivision property. A private roadway ran along the Smiths' side of the boundary. There was a twelve or fifteen-inch metal culvert beneath the roadway immediately opposite the pond. Underground street drains throughout the subdivision flowed into the pond.

After homes had been built near the pond and sold, owners complained about mosquitos, odors and possible hazards of the pond. In response Kirby replaced the pond with an underground "siltation tank" by backfilling the pond with coarse material which was supposed to accommodate a large volume of water from the drainage system. Excess irrigation water from higher adjacent farm lands as well as surface drainage and storm water from the subdivision went into this system and was discharged through the culvert onto the Smiths' property. The Smiths, contending these discharges were greater and more continuous than they had been historically, removed the culvert beneath their private roadway. This caused the drainage system to back up, flooding streets in the subdivision.

In the action brought by ACHD, the court decided that the former pond apparently had been successful—at least in avoiding excessive discharges of water onto the Smiths' property. As recited in *Smith I*, the district court's original judgment ordered Kirby to reconstruct a *detention pond* which would "*hold and retain at least 18,000 cubic feet of storm drainage water.*" *Ada County Highway Dist. v. Smith, supra,* at 328, 699 P.2d at 428 (emphasis added). The Supreme Court affirmed this order but remanded to clarify that Kirby was the only party obligated to construct the pond and that the Smiths have no obligation to accept water onto their property until the pond "is in place and is in fact accommodating 18,000 cubic feet of water." *Id.* at 328, 699 P.2d at 428.

Kirby constructed a detention pond. Its facial dimensions show a capacity slightly exceeding 18,000 cubic feet if the pond could be filled to the top of its banks. Evidence at the show cause hearing on remand, however, indicated that the pond would, at best, hold only 16,900 cubic feet because the elevation of a nearby street drain was lower than the banks of the pond. Even this capacity for "storm drainage water" is suspect because of the likelihood that the pond accumulates groundwater which decreases the capacity for receiving surface drainage water. The evidence shows that the groundwater level fluctuates throughout the year generally reaching its highest level in late summer because of extensive use of irrigation water on higher properties during the farming season. On the other hand, the evidence also indicated that the subdivision's entire drainage system, including pipes, the pond, and other appurtenances, provided a total holding capacity in excess of 18,000 cubic

feet. Based upon this "system" approach, the district court determined that Kirby had satisfied his obligation to hold and retain 18,000 cubic feet of water. The Smiths were not satisfied. They appealed again, contending that the district court's order did not comply with the Supreme Court's directive on remand.

■ Once an appellate court has stated a legal principle and has resolved an issue by application of that principle, it becomes the law of the case. The trial court cannot alter the outcome of that issue. *E.g., Suitts v. First Sec. Bank of Idaho, N.A.,* 110 Idaho 15, 713 P.2d 1374 (1985). Therefore, when an appellate court remands a matter back to the trial court, the trial court's further actions are directed by the terms of the mandate. *See Jordan v. Jordan,* 132 Ariz. 38, 643 P.2d 1008 (1982) (stating the general rule but noting an exception not applicable here); *Vinton Eppsco, Inc. v. Showe Homes, Inc.,* 97 N.M. 225, 638 P.2d 1070 (1981).

■ The records of the 1983 trial and the 1986 show cause hearing are before this Court on appeal. At the trial an engineer testified that the original pond was designed to hold 13,500 cubic feet of water with a water depth of one and one-half feet. At this designed capacity the water surface would be six inches below the top of the banks. However, if the pond was filled to the top of its banks, it would hold 18,000 cubic feet. This explains the trial court's finding that the "intended capacity was approximately 13,500 cubic feet of water with a maximum capacity of 18,000 cubic feet of water." Engineering testimony at the trial established that the original pond was not intended, designed or built to "retain"—that is, hold indefinitely—18,000 cubic feet of storm drainage water. Rather, the pond was designed to "retain" at least 9,000 cubic feet of water.

This apparent discrepancy as to the designed capacity of the original pond was explained. The designers were anticipating "five year" storms that produced an estimated volume of water on the subdivision with predictable regularity. Historically, some of this water would run quickly onto the Smith property, some would be "detained" on the subdivision lands for short periods of time before running off and some would be absorbed. The subdivision drainage system was intended to replicate —and even to lessen—the historic flows. Thus, there was testimony by an engineer at trial that the original pond was designed to "retain" 9,000 cubic feet of water from one of these "five year" storms. The entire drainage system, including the pond, was designed to "detain" a larger volume of water for a short period of time so that part of the storm waters would be delayed and controlled in the runoff process. There was testimony that the entire drainage system, including catch basins, pipes, manholes, boxes and the pond, could accommodate 18,000 cubic feet of water. Some of this would be "retained" indefinitely until lost by percolation or evaporation and some would merely be "detained" on the subdivision for short periods of time until it could escape through the outlet of the system. The pond was dug in porous material which naturally allowed impounded water to filter into the ground until it reached groundwater level. Additionally, the system was built to accept some irrigation waste water coming onto the subdivision property—as it had done before the subdivision was built—and to convey this water into the pond near the Smiths' culvert. Undisputed evidence at trial showed that, historically, such irrigation waste water had flowed through the Smiths' culvert. Thus, the original drainage system was designed to replicate the historic flows of water off of the subdivision property.

During the trial the questions put to witnesses about the system's operation often failed to discriminate between "retention" and "detention" or between "retain" and "detain." It is not surprising that the judgment—prepared by counsel—required reconstruction of a "detention pond" sufficient to "retain" at least 18,000 cubic feet of storm drainage water. The Supreme Court in *Smith I* noted that the 1983 order of the district court was ambiguous. The Court specifically addressed some of the

ambiguity. Following the show cause hearing, the district court noted that although the 1983 order referred to a detention pond with a 18,000 cubic feet capacity, the court's memorandum decision had stated "that the *system* on the subdivision property must be expanded to hold on that property 18,000 cubic feet of water prior to any water passing onto the Smith property." (Emphasis added.) The district judge concluded that he was entitled to clarify, although not modify, his earlier decision. The district judge did so by again finding that "the system" on the subdivision had a capacity to accommodate 18,000 cubic feet of water. We hold this clarification was permissible within the Supreme Court's mandate.

During the show cause hearing the Smiths elicited much discussion of the groundwater level in the area of the pond, contending that groundwater seeping into the present pond reduces its capacity to store surface drainage water from the subdivision. We note, first, that no such contention was made at the trial concerning the original pond. Second, no conclusive evidence was provided that groundwater—as distinguished from irrigation waste water collecting in the area because of the absent culvert—would prevent the present pond from functioning as intended. Third, engineer witnesses testified that without the culvert being replaced so that excess irrigation waste could escape as it had historically, the storm drainage system would not function as intended. This testimony was obviously based on the fact that the entrapped irrigation waste water contributed heavily to the groundwater in this area. Finally, there was substantial and competent evidence that the present pond, in elevation and capacity, essentially matched the original pond about which the Smiths had made no complaints. While, as we note later, the Smiths are not barred from a future showing that the present installation allows flows onto their property exceeding historic flows, they have not made such a showing at the present time.

Substantial evidence shows that the pond itself when filled to the level of the lowest street drain will hold approximately 16,900 cubic feet. Additionally, the underground drainage system will hold in excess of 1,600 cubic feet. This replicates the designed capacity of the original system. Accordingly, we hold that the district court order does not violate the directive of the remand. We affirm the order.

The scope of the show cause hearing was limited. Additional hearings may be necessary to assure that the installations ordered by the court are working as intended. Until this dispute is finally resolved, all parties may wish to monitor the system's operation. By upholding the present order we impose no limitations on the trial court to accept further evidence of needed changes or refinements as might be necessary to protect the rights of the parties. If the court determines there is a need for further testimony of experts on the operation of the present system, the court may take such evidence, make further findings and orders as are necessary to finally resolve this dispute.

The Supreme Court noted in *Smith I* that based on present experience and evidence concerning the operation of the water detention system on the subdivision, the district court could not determine for a certainty that the system will prevent "casting waters upon the Smith property in excess of the quantities historically accommodated by that property." 108 Idaho at 328, 699 P.2d at 428. Accordingly, the Court held that "this case should not be res judicata as to the Smiths seeking further relief should the system not operate as intended." *Id.* This holding applies as well following our disposition of this appeal.

Both the Smiths and the ACHD have requested attorney fees on appeal pursuant to I.C. § 12–121 and I.R.C.P. 54(e)(1). While ACHD is the prevailing party in this appeal, we decline to award fees. The appeal has not been taken or pursued frivolously, unreasonably or without foundation.

The district court order is affirmed. The case is remanded for further proceedings consistent with this opinion, if and when

required. Costs are awarded to ACHD against the Smiths.

WALTERS, C.J., and BURNETT, J., concur.